**GENERAL SIGNAL CORPORATION,**
Plaintiff–Appellant–Cross–
Appellee,

v.

**MCI TELECOMMUNICATIONS
CORPORATION, Defendant–
Appellee–Cross–Appellant.**

Nos. 94–15476, 94–15534.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 15, 1995.

Decided Sept. 26, 1995.

Ronald S. Katz, Coudert Brothers, San Francisco, California, for plaintiff-appellant-cross-appellee.

Christopher Wolf and Duane K. Thompson, Proskauer, Rose, Goetz & Mendelsohn, Washington, D.C., for defendant-appellee-cross-appellant.

Before: D.W. NELSON and T.G. NELSON, Circuit Judges, and KING,* District Judge.

D.W. NELSON, Circuit Judge:

## OVERVIEW

Appellant/Cross–Appellee General Signal Corporation ("GSX") appeals the district court's judgment in favor of appellee/cross-appellant MCI Telecommunications Corporation ("MCI") in its diversity action alleging fraud and breach of contract arising out of an

---

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

agreement to develop the INpath, a telecommunications device. MCI cross-appeals from the district court's judgment as a matter of law on its counterclaim alleging fraud by GSX, and from the court's imposition of costs against MCI for dismissing its original counterclaims without leave of the court.

GSX argues that the judgment must be reversed because (1) the district court erred in finding that New York law governed the case; (2) the court's denial of summary judgment to GSX on MCI's counterclaim was erroneous and prejudicial to GSX; and (3) the district court's imposition of rigid time limits on the length of trial and its refusal to allow additional time for cross-examination or rebuttal testimony denied GSX due process of law. MCI argues that (1) the district court erred in granting judgment as a matter of law to GSX on MCI's fraud counterclaim because MCI presented evidence at trial such that a reasonable juror could find for MCI; and (2) the imposition of sanctions was unjustified because the district court had given MCI leave to amend its pleadings. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

On June 9, 1989, GSX and MCI entered into a Joint Development Agreement ("JDA") under which MCI agreed to fund GSX's development of the INpath, a telecommunications data support unit. Once MCI provided technical specifications, GSX was required to produce and supply sufficient quantities of the product to satisfy MCI's needs.

After significant difficulties and delays in the development of the INpath, the parties entered into an agreement on February 5, 1991 ("the Letter Agreement") under which GSX, upon receipt of $5 million, released MCI from its commitment to purchase the end product and to fund the INpath development beyond an additional $500,000. The Letter Agreement also released GSX from any obligation to complete the project, but it required MCI to market the product to its customers if GSX successfully produced an INpath that passed laboratory tests.

During 1991, GSX, through a division known as Telecommunications Technology, Inc. ("TTI"), continued to develop the INpath in consultation with MCI officials. In October 1991, MCI informed GSX that the INpath as developed no longer met its functional requirements and that MCI no longer had any interest in purchasing or marketing the INPath.

In November 1991, GSX filed suit against MCI, alleging breach of contract and fraud. GSX charged that MCI breached its obligation under the Letter Agreement to provide specifications to GSX and to market the end product. In addition, GSX asserted that MCI fraudulently failed to inform GSX that it had decided prior to the Letter Agreement that it had no intention to market the INpath, thereby inducing GSX to sign the Letter Agreement and to continue development during 1991.

In its answer, MCI asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and false advertising. After GSX amended its complaint in April 1993, MCI filed an amended answer which contained counterclaims alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud in the inducement. The district court permitted the new counterclaims but imposed costs against MCI under Fed. R.Civ.P. 41(a) for dismissal of the original counterclaims without leave of the court. In October 1993, the district court denied GSX's motion for summary judgment on MCI's fraud counterclaim.

Prior to trial, the district court limited the case to 56 hours of court time, evenly divided between the two sides. Breaks and delays in the trial were charged equally to both sides. After GSX ran out of time, the court granted GSX five additional minutes for cross-examination of each remaining witness, but denied GSX's motion to present a rebuttal case. At the close of testimony, the district court granted judgment as a matter of law in favor of GSX on MCI's fraud counterclaim. The jury returned a verdict in favor of MCI on GSX's claims. After the district court denied GSX's motion for a new trial, GSX timely appealed.

## DISCUSSION

### I. Choice of Law

■ GSX alleges that the district court improperly held that New York law applied to this case because (1) MCI was estopped from arguing for the use of New York law because it had previously filed papers invoking California law; or (2) the choice of law provision of the JDA did not apply to this case. This court reviews decisions concerning the appropriate choice of law de novo. *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1505 (9th Cir.1993).

#### A. Estoppel and Waiver

■ GSX argues that MCI waived its right to have New York law applied to this case because it did not seek a ruling on the issue until July 1993, 21 months into the case and three months before trial. GSX relies on case law which invokes the doctrine of judicial estoppel, which precludes a party from taking an inconsistent position in the same litigation if (1) the court actually adopted the inconsistent statement earlier in the litigation (the majority view), or (2) the change in position amounts to playing "fast and loose" with the court (the minority view). *Yanez v. United States,* 989 F.2d 323, 326 (9th Cir.1993); *Morris v. State of California,* 966 F.2d at 452–53 (9th Cir.1991). We have yet to adopt one of these definitions of judicial estoppel, *see Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir.1993), and we need not address the choice here because neither alternative is applicable to the present case.

Although the Special Master in this case found that "a reasonable person ... would have assumed that the parties both thought California law applied to the substantive issues of this case," the district court did not adopt the view that California law applied. Thus, the majority view of judicial estoppel would not apply. *See Britton,* 4 F.3d at 744; *Radiation Sterilizers, Inc. v. United States,* 867 F.Supp. 1465, 1473 (E.D.Wash.1994).

Moreover, MCI's citation to California law in its earlier papers and its delay in raising the choice of law issue does not constitute "playing fast and loose" with the court. This aspect of judicial estoppel "is reserved for more egregious conduct than just 'threshold' inconsistency." *Britton,* 4 F.3d at 744. Although MCI cited California law in earlier papers, it never specifically asserted as a legal argument that California law was applicable. *See id.* In fact, the prior motions predominantly related to interpretation of federal procedural rules rather than state substantive law. Furthermore, we are persuaded by the reasoning of the *Radiation Sterilizers* court, which rejected the precise argument presented here. 867 F.Supp. at 1473. There, a party's brief argument in an earlier motion that Washington law applied to the case did not bar that party's later motion to apply Georgia law, because the court had not yet ruled on the issue. *Id.* Thus, judicial estoppel is inapplicable.

■ To the extent that GSX's waiver argument goes beyond the judicial estoppel doctrine, it still should fail because GSX has not shown any evidence of an intentional delay, and because the motion on choice of law came before summary judgment. *See id.* at 1475 (applying this reasoning). Although a case cited by GSX held that a party had waived the right to seek belated application of Illinois law, that party made its motion after the district court had specifically decided, without objection, that New York law should apply. *See Muslin v. Frelinghuysen Livestock Managers, Inc.,* 777 F.2d 1230, 1231 (7th Cir.1985). Because there was no earlier ruling on choice of law, we reject GSX's waiver argument.

#### B. Applicable Law

■ On the merits, GSX argues that the district court erred in finding that the applicable law should be determined by the choice of law provision of the JDA, which states that the JDA "shall be interpreted, construed and governed by the laws of the State of New York." Because GSX conceded that the Letter Agreement modified, rather than superseded, the JDA, its argument rests on the proposition that the unmodified terms of the JDA are not applicable to the Letter Agreement. In assessing this argument, we apply the choice of law rules of California, the forum state for this action. *See Day & Zim-*

mermann, Inc. v. Challoner, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); Consul Ltd. v. Solide Enterprises, Inc., 802 F.2d 1143, 1146 (9th Cir.1986).

■ We find that the JDA choice of law provision applies to disputes arising out of the Letter Agreement. Although the Letter Agreement does not explicitly incorporate any provisions of the JDA, the JDA's provision for written modifications or amendments does not mandate such language in order to preserve the unmodified terms. Not only does California law fail to impose such a requirement, but it provides that the unmodified terms of the original agreement are to be applied together with the terms of the new, modifying agreement. See In re Ferrero's Estate, 142 Cal.App.2d 473, 298 P.2d 604, 607–08 (1956); Hannagan v. Feather River Pine Mills, Inc., 121 Cal.App.2d 758, 264 P.2d 159, 160 (1953).

Finally, California law broadly construes this type of contractual choice-of-law provision. See Nedlloyd Lines B.V. v. Superior Court, 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 335, 834 P.2d 1148, 1153 (1992) ("When two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from *or related to* their contract.") (emphasis added). Just as the breach of fiduciary duty claim in Nedlloyd could "exist only because of" the shareholders agreement, id. at 336, 834 P.2d at 1154, the actions arising out of the Letter Agreement could exist only because of the JDA. Accordingly, we hold that the JDA's choice-of-law provision applies.

■ Under California choice-of-law rules, we must apply the law designated by the contractual provision unless (1) the chosen state has no substantial relationship to the parties or transaction; or (2) such application would run contrary to a California public policy or evade a California statute. See id. at 334, 834 P.2d at 1152; Consul, 802 F.2d at 1146–47. The fact that GSX is incorporated in New York is sufficient to establish a "substantial relationship." See Nedlloyd, 834 P.2d at 1153.

We reject GSX's assertion that application of New York law would violate California public policy because New York requires a higher burden of proof on fraud claims— clear and convincing evidence—than California's preponderance standard. The fact that New York law differs from California law does not necessarily signify that application of New York law would contravene California public policy. See Sarlot–Kantarjian v. First Pennsylvania Mortgage Trust, 599 F.2d 915, 918 (9th Cir.1979); Gamer v. du-Pont Glore Forgan, Inc., 65 Cal.App.3d 280, 135 Cal.Rptr. 230, 235 (1976). No court has held that a higher burden of proof violates California public policy, and we decline to do so here. Thus, we affirm the district court's decision to apply New York law.

**II. Summary Judgment on MCI's Counterclaim**

■ GSX argues that the district court's denial of its motion for summary judgment on MCI's fraud counterclaim was improper and prejudiced GSX by forcing it to use precious trial time against a meritless counterclaim, and by giving the jury the impression that GSX may have engaged in improper conduct. MCI counters that this court cannot review a denial of summary judgment once the case has been tried on the merits. We find that MCI is correct.

We have held previously that we may not review a denial of summary judgment after a jury has decided the case. Lum v. City & County of Honolulu, 963 F.2d 1167, 1169–70 (9th Cir.) (jury verdict for the moving party), cert. denied, —— U.S. ——, 113 S.Ct. 659, 121 L.Ed.2d 585 (1992); Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1358–59 (9th Cir.1987) (jury verdict against the moving party). GSX argues that Lum should not apply because in the present case, the district court granted a directed verdict on MCI's fraud counterclaim, rather than sending the case to the jury.

We disagree. The Lum court established a broad rule for this circuit by stating that "[w]e adhere to the majority view that . . . there is no useful purpose in reviewing the pretrial ruling on summary judgment after a plenary trial on the merits." 963 F.2d at

1170 n. 1. This holding accords with the position of several other circuits that have rejected review of denials of summary judgment. *See, e.g., Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp.,* 51 F.3d 1229, 1236 (4th Cir.1995); *Watson v. Amedco Steel, Inc.,* 29 F.3d 274, 278 (7th Cir.1994); *Black v. J.I. Case Co.,* 22 F.3d 568, 572 (5th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 579, 130 L.Ed.2d 494 (1994).

Although the fact that a court eventually grants a directed verdict on a claim may cast doubt on the wisdom of the earlier denial of summary judgment, it does not justify opening the summary judgment decision to appellate scrutiny. Such review would force appellate courts to engage in a superfluous review of two separate sets of evidence: the evidence presented at summary judgment, and that presented at trial. *See Black,* 22 F.3d at 572. It would also undermine the district court's discretion to send a case to trial "if the judge has doubt as to the wisdom of terminating the case before trial." *Id.* Finally, even if denial of summary judgment arguably could prejudice the moving party by forcing it to expend resources on a frivolous claim, that problem is more properly addressed through a motion for interlocutory appeal. *See Lum,* 963 F.2d at 1169–70; *Chesapeake Paper,* 51 F.3d at 1237.

■■■■ GSX's reliance on *Hilton v. Mumaw,* 522 F.2d 588 (9th Cir.1975), is misplaced. Although *Hilton* involved the precise factual scenario at issue here—an appeal from a denial of summary judgment after a directed verdict had been entered on the claims in question—the *Hilton* court dismissed as moot those claims for which it affirmed the directed verdict. *See id.* at 603. Thus, although it did not explicitly consider the issue of reviewability, it recognized that such an appeal is not properly before the appellate court. Accordingly, we hold that we may not review the denial of summary judgment on a claim once a directed verdict has been entered on that claim. We thus reject GSX's argument that denial of summary judgment was improper.

## III. Time Limits

■■■ GSX alleges that the district court violated its due process rights by imposing strict time limits on the trial, limiting its cross-examination of several MCI witnesses, and denying its motion to present a rebuttal case because GSX had run out of time. This court reviews issues relating to the management of trial for an abuse of discretion. *Miller v. Los Angeles County Bd. of Educ.,* 799 F.2d 486, 488 (9th Cir.1986).

### A. Waiver

■■■ As a threshold issue, MCI argues that GSX waived its due process argument by agreeing to the time limits and asking that they be enforced throughout the trial. MCI cites *Reilly v. United States,* 863 F.2d 149 (1st Cir.1988), in which the First Circuit found waiver because a party "sandbagg[ed]" by "wait[ing] to see which way the wind blew" before objecting to the court's use of a technical advisor. *Id.* at 160. Unlike in *Reilly,* in which the appellant waited until after the district court had entered judgment to raise an objection, *id.* at 154 (objection raised in motion for new trial), GSX raised its objections prior to judgment, at the time when the limits began to have adverse effects on its case. Although GSX initially stated that it would be bound by the time limits and urged strict enforcement of the limits against MCI, it expressed concern during trial that court breaks had consumed too much time and asked that the court ensure that each side receive the full 28 hours originally allotted. In addition, once the court began curtailing cross-examination on account of time, GSX objected and sought to give offers of proof. At the close of MCI's case, GSX's motion for additional time for rebuttal was denied. Such pre-judgment objections are sufficient to avoid waiver. *See Johnson v. Ashby,* 808 F.2d 676, 678 (8th Cir.1987) (in finding waiver of objection to time limits, indicating that objection at the close of evidence or as part of a motion for additional time for a rebuttal case would provide evidence of non-waiver).

### B. The Merits

GSX raises several arguments relating to the time limits: (1) the time limits were

unreasonably short in light of the fraud counterclaim and the use of New York law; (2) the time limits were enforced too rigidly; and (3) the district court erred in refusing to allow additional cross-examination and rebuttal testimony without considering the probative value of the proffered evidence.

### 1. Reasonableness of the Time Limits

Generally, a district court may impose reasonable time limits on a trial. *Deus v. Allstate Ins. Co.,* 15 F.3d 506, 520 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994); *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1408 (7th Cir.1991); Fed.R.Civ.P. 16(c)(15) (listing discussions over time limits as a proper topic for pretrial conference). We are not persuaded that the 14–day limit was unreasonable. GSX and MCI agreed in the joint pretrial statement that 14 days (56 hours) would be sufficient for the trial. *See Monotype Corp. v. International Typeface Corp.,* 43 F.3d 443, 451 (9th Cir.1994) (finding the court's time limit reasonable, even though it provided significantly less time than the parties estimated would be required); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1170–71 (7th Cir.) (same), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Although GSX correctly asserts that the 14–day limit was imposed *before* MCI added the fraud counterclaim, the pretrial statement, in which GSX acquiesced to the overall time allocation, was filed *after* the counterclaims were entered. Thus, the parties' estimate of required time reflected the need to address the counterclaims.

GSX's argument that the time limit was unreasonable in light of the use of New York law fails for similar reasons. Although GSX correctly notes that the court's decision to use New York law (which entailed a higher burden of proof) came after the time limit had been established, GSX has provided no evidence that it requested additional trial time on this basis, nor has it shown what evidence had to be included beyond what was required to prove fraud under California law.

Thus, we cannot conclude that the original time limit was unreasonable.

### 2. Flexibility of Time Limits

GSX argues that the district court enforced the time limit too rigidly by (1) counting court breaks toward the time limits, (2) refusing to permit GSX to complete its cross-examination, and (3) denying GSX's motion to present rebuttal testimony.

Generally, courts look upon rigid hour limits for trials with disfavor. *Monotype,* 43 F.3d at 450–51; *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 473 (7th Cir.1984). In this instance, the court informed the parties during trial that court breaks would be charged to the allocated time. After GSX ran out of time during MCI's case, the court granted GSX five minutes to cross-examine each of MCI's last four witnesses, but refused to extend cross-examination any further. GSX asked for an additional 1.5 hours to present rebuttal testimony, then later reduced the requested time to 15 minutes. Both requests were denied because time had run out.

Although the court eventually imposed a rigid limit on time, its actions, when viewed in the context of the entire trial, were reasonable. Even if the court did not explicitly state its policy of charging break time to the parties, it regularly kept both sides informed of the time remaining throughout the trial. The parties' frequent, specific inquiries about the time accounting reveal that the court's method of charging time did not unfairly surprise either party. Moreover, the court added an additional day of testimony (3.5 hours) at the end of the trial. By ensuring that GSX had time to conduct limited cross-examination of all MCI witnesses, the court satisfied the requirements of due process. *See Harries v. United States,* 350 F.2d 231, 236 (9th Cir.1965) (stating that a limitation on cross-examination denies due process only if it is "so severe as to constitute a denial" of the right to cross-examine).

Most significantly, the record reveals that GSX, not the court, was primarily responsible for its inability to present its case within the time limits. GSX used the vast majority

of its time during its case in chief, introducing duplicative evidence and taking a leisurely approach to its presentation. In *Deus,* the court relied in part on the fact that the appellant "improvidently squandered much of his time" in finding no abuse of discretion from enforcement of a three-day trial limit. 15 F.3d at 520. GSX's claim that it relied on the court's promise that it would grant additional time as needed is not persuasive, because the only promise by the court was to give "five minutes to make a point"—a promise which the court kept when it granted GSX additional time for limited cross-examination.

GSX's counsel also failed to heed at least five specific warnings by the district court to save sufficient time for cross-examination during MCI's case; he brushed off such admonitions by stating that his practice is to ask only five questions of a witness on cross-examination. In *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404 (7th Cir.1991), the court found no abuse of discretion arising from enforcement of a time limit after the counsel had ignored warnings to expedite her examination. *Id.* at 1409. GSX's conscious decision to risk running out of time is evident from its response to a motion by MCI to require GSX to conclude its case-in-chief in order to leave enough time for MCI's case:

> We are using our allotted 28 hours in the manner we believe is most effective for the presentation of our case, and do not believe that we should be penalized since MCI has chosen to use an almost equal amount of its time in cross-examination of our witnesses. We have found that your time limits have assisted us in presenting a better and more efficient case ... [W]e do not believe either party should be given additional hours.

Thus, this case is distinguishable from *McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991), in which the court expressed strong disapproval of the rigid application of a time limit. *Id.* at 115. Whereas the defendant's lack of time in that case was attributed primarily to the plaintiff's extensive case-in-chief, *see id.* at 115, the lack of time available at the end of

this trial was largely the consequence of GSX's mismanagement of its case-in-chief, for which neither MCI nor the court was responsible.

In addition, allocation of additional time to GSX would have been unfair to MCI. At the time of GSX's request for additional time, MCI represented to the court that it had reluctantly condensed its cross-examination of GSX's witnesses in order to save enough time for its case-in-chief. Just as GSX has argued before this court regarding MCI's witnesses, MCI asserted that several of the GSX witnesses had mischaracterized the facts, but that it was unable to impeach them thoroughly within the allotted time. Thus, to grant GSX additional time would reward its inefficient use of time and penalize MCI for managing its time.

 Although district courts have discretion to impose rules to expedite completion of trials, we caution that they must not adhere so rigidly to time limits as to sacrifice justice in the name of efficiency. Under the circumstances of this case, however, we find that the district court's management of its time limits was sufficiently flexible. *See Deus,* 15 F.3d at 520; *M.T. Bonk,* 945 F.2d at 1409.

### 3. Admission of Cross–Examination and Rebuttal Testimony

GSX also argues that the district court erred when it excluded GSX's proffered rebuttal evidence and cross-examination without weighing the probative value against the harm of delay, as required by Fed.R.Evid. 403. The parties dispute whether the district court conducted a Rule 403 analysis. Although the fact that the court received a written memorandum from GSX outlining the probative value of the proffered rebuttal case indicates that it was aware of all the factors prior to its ruling, its denial of the motion only cited the issue of delay.

 As a general rule, evidence may not be excluded solely to avoid delay. *See Secretary of Labor v. DeSisto,* 929 F.2d 789, 795 (1st Cir.1991); *First Nat'l Bank & Trust Co. v. Hollingsworth,* 931 F.2d 1295, 1305 (8th Cir.1991); *Johnson,* 808 F.2d at 678. Under Rule 403, the court should consider the pro-

bative value of proffered evidence and balance it against the harm of delay. *DeSisto*, 929 F.2d at 789. However, several courts have upheld exclusion of rebuttal testimony based on inability to conform to time limits, even though the district court did not assess the probative value of the evidence. In *Thweatt v. Ontko*, 814 F.2d 1466 (10th Cir. 1987), the court affirmed the exclusion of four rebuttal witnesses who had not appeared as scheduled, because accommodation of them would require an extension of the allotted time. *Id.* at 1469–70; *cf. Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 466 (9th Cir.1987) (holding that the court's rigid scheduling rules did not constitute an abuse of discretion, even though plaintiffs claimed that the rules effectively denied them the opportunity to present rebuttal evidence), *cert. denied*, 484 U.S. 853, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987).

██ Although it clearly would have been advisable for the district court to weigh explicitly the probative value of GSX's evidence in deciding whether to grant additional time, we need not decide whether the district court's denial of GSX's motion for additional time constituted error, because the exclusion on account of the time limit did not prejudice GSX. *See, e.g., McKnight*, 908 F.2d at 115 (requiring prejudice to reverse on account of rigid time limits); *Flaminio*, 733 F.2d at 473.

GSX alleges prejudice arising from its inability to present three pieces of evidence on rebuttal. First, it sought to call Allan Thompson of TTI to rebut the testimony of B.R. Bagby of MCI relating to a thank you note that Thompson had drafted, but had never sent to Bagby. Bagby testified that the note indicated that he had assured Thompson at an October 15 meeting that MCI would honor the Letter Agreement. However, Thompson's testimony would have been cumulative because he had testified earlier that, although Bagby had made such an assurance at the meeting, he had never believed it. Even if the note proved that Thompson believed MCI's representation that it would honor its agreement, that fact does not resolve the issue of whether MCI, in fact, reneged on the Letter Agreement soon thereafter. Thus, the exclusion of this evidence did not prejudice GSX.

Second, GSX asserts that it was prejudiced by the inability to present testimony, in response to a jury question, on the amount of purchases by MCI from TTI after October 3, 1991. In GSX's case-in-chief, however, GSX had an opportunity to address the jury question and had elicited testimony that only a "very small percentage" of TTI's post-October 1991 business came from MCI. Moreover, the MCI witness's testimony that it had made $750,000 in purchases from GSX was not misleading because the witness noted that only a small part of these sales were from TTI.

Finally, GSX argues that it was prejudiced by its inability to show a videotaped demonstration of the INpath in order to rebut MCI's claims that the INpath did not work in 1991. However, earlier in the trial, the district court had excluded the videotape on relevance grounds, because a showing that the INpath works today does not have probative value on the question of whether it worked in 1991. Thus, its exclusion was not prejudicial.

GSX further asserts that it was prejudiced by the lack of additional time to cross-examine five MCI witnesses, for whom it was only permitted between four and twelve minutes each. We disagree. Bob Born's testimony about pre–1991 failures, although possibly vulnerable upon additional cross, was not uncontroverted by GSX: GSX had introduced evidence that the INpath passed tests in 1991, as well as testimony from other witnesses to contradict Born. Although GSX sought more time to challenge Jack Wimmer's testimony on prior tests and MCI's provision of specifications, GSX had already used Wimmer's deposition to impeach on one point, thus raising doubt as to his credibility. Eric Roberts, Dan Reynolds, and Mack Schwing primarily testified on damages, an issue that the jury did not reach. In addition, the record shows that GSX had significant time to examine Roberts on direct in its own case-in-chief, and that it squandered some of its cross time with irrelevant questioning. *See Deus*, 15 F.3d at 520. Because we find no prejudice arising from exclusion of

the proffered testimony, we affirm the district court's refusal to grant GSX additional time. *See Flaminio,* 733 F.2d at 473.

## IV. Judgment as a Matter of Law on the Fraud Counterclaim

■ In its cross-appeal, MCI argues that the district court erred in granting judgment as a matter of law in favor of GSX on MCI's fraud counterclaim. MCI claims that the district court, in focusing on the lack of evidence to support the allegation that GSX had decided to shutdown TTI before the Letter Agreement, failed to consider MCI's alternative theory that GSX had decided to "sell or shutdown" TTI, and that the failure to disclose this fact was a fraudulent misrepresentation. A district court's grant of judgment as a matter of law is reviewed de novo. *In re Hawaii Federal Asbestos Cases,* 960 F.2d 806, 816 (9th Cir.1992). "[A] directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict." *McGonigle v. Combs,* 968 F.2d 810, 816 (9th Cir.1992).

### A. Waiver

■ GSX argues that MCI waived its "sell or shutdown" theory by failing to raise it before the district court. Generally, this court does not consider issues not properly raised below. *Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 515 (9th Cir.1992). Although MCI did not explicitly allege in its Answer and Counterclaims pleading that GSX had a "sell or shutdown" plan, that pleading indirectly referred to such a plan by stating that "it made sense to give the appearance of TTI as a viable, on-going unit ... even though General Signal was preparing for a shut down if the company could not be sold." In addition, MCI articulated the "sell or shutdown" theory in its trial brief. *Cf. Eagle v. American Telephone & Telegraph Co.,* 769 F.2d 541, 548 (9th Cir.1985) (finding that failure to mention a theory in a pre-trial status conference order constituted waiver), *cert. denied,* 475 U.S. 1084, 106 S.Ct. 1465, 89 L.Ed.2d 721 (1986). Furthermore, the fact that GSX felt compelled on redirect to question Kenneth Tingley, a GSX official, on whether there was a plan to sell or shut-down indicates that GSX was on notice of MCI's theory and had an opportunity to counter it. *See Self Directed Placement Corp. v. Control Data Inst.,* 908 F.2d 462, 467 (9th Cir.1990) (finding that a party had raised a theory sufficiently to put the opposing party "on notice" of the claim). Thus, we find a lack of waiver and proceed to the merits of the claim. *See id.*

### B. The Directed Verdict

■ In order to prove fraud under New York law, a party must show (1) a material, false representation; (2) knowledge of falsity; (3) intent to defraud; (4) reliance upon the representation; and (5) damages. *Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994). As MCI principally relies on the theory that GSX fraudulently concealed the material fact of a sell or shutdown plan, it must also show that there was a duty to disclose, which occurs if (1) the party made a partial or ambiguous statement; (2) the parties stand in a fiduciary or confidential relationship; or (3) one party "possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993). Fraud must be proven by clear and convincing evidence. *Leucadia, Inc. v. Reliance Ins. Co.,* 864 F.2d 964, 971 (2d Cir. 1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3160, 104 L.Ed.2d 1023 (1989).

■ The evidence presented at trial was insufficient to avoid judgment as a matter of law. The only possible affirmative misrepresentation was Tingley's assertion, made prior to the signing of the Letter Agreement, that TTI could complete the INpath by the end of 1991. This expression of confidence, however, would not constitute a misrepresentation unless there was evidence that Tingley knew that the prediction was false. *See The Sample, Inc. v. Pendleton Woolen Mills, Inc.,* 704 F.Supp. 498, 506 (S.D.N.Y.1989); *Schwartz v. Newsweek, Inc.,* 653 F.Supp. 384, 389–90 (S.D.N.Y.1986), *aff'd,* 827 F.2d 879 (2d Cir. 1987). Although this statement was more optimistic than the gloomy assessments made

by Tingley in earlier written memos, it was based on positive reviews that were more recent than those used for Tingley's prior assessments. In fact, after the Letter Agreement, TTI continued to work on the project and was, in its opinion, ready to present a product by Fall 1991 that met MCI's original specifications. Thus, Tingley's affirmative statement did not constitute a fraudulent misrepresentation. *See The Sample,* 704 F.Supp. at 506.

MCI's counterclaim therefore rests on the alleged fraudulent concealment of a material fact—the purported plan to "sell or shutdown" TTI. This theory of liability fails because there is insufficient evidence that GSX adopted such a plan prior to the Letter Agreement. MCI relies on several memos written by Tingley, in which he expressed concerns over the prospects for successful completion of the INpath project and recommended that GSX consider strategies to discontinue its involvement in the project and/or TTI, which included negotiating a release of obligations with MCI. In one memo, dated January 11, 1990, he listed several options for GSX, including selling TTI and shutting it down, and advised that, "[a]n exit strategy needs urgent consideration." Tingley admitted that he never revealed the contents of these memos to MCI. MCI also submitted undated notes by TTI President Alan Thompson which could be construed to indicate that he believed that MCI's willingness to sign the Letter Agreement "[p]layed into GS's hands."

Although the proffered documents reveal that GSX was aware that the INpath project was not going smoothly, that it might be advisable for GSX either to sell TTI or to close that division, and that a buyout agreement (such as the Letter Agreement) might be advantageous to GSX, they do not permit a reasonable juror to find clear and convincing proof that GSX had adopted, but did not disclose, a "sell or shutdown" strategy prior to the Letter Agreement. None of the documents offered by MCI provide direct evidence that the corporation had made a firm decision. Although some documents discuss possible sale or shutdown plans, those documents all post-date the Letter Agreement

and thus do not reveal a plan which should have been revealed to MCI prior to its signing. *See Morin v. Trupin,* 711 F.Supp. 97, 104 (S.D.N.Y.1989) (holding that possible misrepresentations in a letter written after the plaintiff made payments to the defendant could not have fraudulently induced the payments).

In fact, the circumstantial evidence cuts against a "sell or shutdown" decision. The fact that the company continued to pour money into TTI and the INpath even after the Letter Agreement provides evidence that it had not reached a firm decision to sell or shutdown. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1470 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). Most significantly, a February 19, 1991 handwritten note by Tingley, upon which MCI relies, lists shutdown, sale of the INpath, sale of TTI, and "keep going" as possible options for GSX. If the company had actually decided before the Letter Agreement to sell or shutdown TTI, then these notes, which postdate the Letter Agreement, would not have included "keep going" as an option.

Absent evidence of a firm pre-Letter Agreement decision to sell or shutdown, MCI's fraud claim must fail under New York law. *See Schwartz,* 653 F.Supp. at 389–90 (finding no fraud arising from the claim that a company would continue to produce a magazine, absent knowledge that such a statement was not, or could not, be true). Several courts, interpreting analogous fraud provisions, have found that failure to disclose the possibility of a sale or shutdown does not constitute fraud. *See California Architectural Building Products,* 818 F.2d at 1470–71 (finding no fraud when a company failed to disclose to its dealers that it had decided to sell or shutdown the company *if* business did not improve within a designated time frame, even though the company made affirmative statements that it was "here to stay"); *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 975 F.2d 1192, 1205 (5th Cir.1992); *Cloverdale Equipment Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 940 (6th Cir.1989) (finding no fraud arising from termination of a distributorship

agreement even though the manufacturer had expressed a desire for a long-term relationship and failed to disclose that it was conducting, but had not completed, negotiations with another potential distributor). Because MCI did not present clear and convincing evidence of a misrepresentation or fraudulent omission, we affirm the district court's grant of judgment as a matter of law in favor of GSX on MCI's fraud counterclaim.

## V. Imposition of Costs

MCI also cross-appeals the district court's order that MCI pay costs of $13,667.25 for dismissing its first set of counterclaims without leave of the court. After both parties had stipulated to allow GSX to file an amended complaint, with the understanding that MCI could amend its Answer and Counterclaims pleading in response, MCI filed an amended Answer and Counterclaims in which it replaced its four original counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and false advertising, with counterclaims alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud in the inducement. The district court deemed this action to be a dismissal of the original counterclaims without leave of the court and imposed sanctions under Fed. R.Civ.P. 41(a)(1) and 41(c).

■■■ MCI claims that the district court improperly applied Fed.R.Civ.P. 41(a) because MCI had not dismissed the action in its entirety, but had merely amended its counterclaims as permitted by the court under Fed.R.Civ.P. 15. GSX argues that even if sanctions were unavailable under Rule 41(a), the court's ruling was authorized by Rule 15. This court reviews the district court's imposition of costs for abuse of discretion. *Stevedoring Servs. of America v. Armilla Int'l B.V.*, 889 F.2d 919, 921 (9th Cir.1989).

### A. Sanctions under Rule 41

■■■ MCI first argues that sanctions under Rule 41 were inappropriate because its amended pleading did not constitute a dismissal pursuant to Rule 41. Under Rule 41, a plaintiff who follows the proper procedures to dismiss an action without order of the court may be subject to costs upon relitigation of the claim. *See* Fed.R.Civ.P. 41(a)(1), (d). However, we have held that Rule 15, not Rule 41, governs the situation when a party dismisses some, but not all, of its claims. *See Ethridge v. Harbor House Restaurant*, 861 F.2d 1389, 1392 (9th Cir. 1988); *see also Gronholz v. Sears, Roebuck & Co.*, 836 F.2d 515, 518 (Fed.Cir.1987); *Management Investors v. United Mine Workers of America*, 610 F.2d 384, 394–95 (6th Cir. 1979).

Although two of the original counterclaims, for breach of contract relating to a confidentiality clause and for false advertising, were dropped from MCI's amended pleading without explanation, MCI never explicitly dismissed any counterclaims. Moreover, a comparison of the original and amended pleadings reveals that two of the new counterclaims, for breach of contract and for breach of the implied covenant of good faith and fair dealing in relation to the Letter Agreement, were substantially similar to two of the original counterclaims, thus revealing that MCI had amended, not dismissed, some of the counterclaims. Thus, Rule 41 is inapplicable because MCI did not dismiss all of its counterclaims. *See Gronholz*, 836 F.2d at 518 (stating that Rule 41 applies to dismissals of entire actions, not to dismissals of claims); *Exxon Corp. v. Maryland Casualty Co.*, 599 F.2d 659, 662 (5th Cir.1979).

■■■ Moreover, Rule 41 is inapplicable because MCI, by immediately asserting new counterclaims against GSX, never released GSX from the need to defend counterclaims. Rule 41 is reserved for circumstances in which the result of the alleged dismissal is that one or all of the defendants are released from the action. *See Ethridge*, 861 F.2d at 1392 (noting that Rule 41 applies to complete dismissal as to all defendants, or partial dismissal of all claims against one codefendant). Thus, the district court's imposition of costs pursuant to Rule 41 was improper.

### B. Sanctions under Rule 15

■■■ GSX asserts that, even if Rule 41 does not justify the sanctions, the sanctions should be affirmed under Rule 15. Although

the district court did not explicitly rely on Rule 15 in its sanctions order, we may affirm the order upon an alternative ground. *See United States v. Washington,* 969 F.2d 752, 755 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993).

Unlike Rule 41, Rule 15 does not explicitly permit the imposition of costs or sanctions by the district court. However, we have held that a district court, in its discretion, may impose costs pursuant to Rule 15 as a condition of granting leave to amend in order to compensate the opposing party for additional costs incurred because the original pleading was faulty. *See Firchau v. Diamond Nat'l Corp.,* 345 F.2d 269, 275 (9th Cir.1965); *see also Local 783, Allied Industrial Workers of America v. General Electric Co.,* 471 F.2d 751, 756 (6th Cir.) (stating that costs may be imposed as condition of leave to amend to avoid prejudice to the opposing party), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); *Cemar, Inc. v. Nissan Motor Corp.,* 678 F.Supp. 1091, 1106 (D.Del. 1988).

We find that the imposition of costs is most properly viewed as such a condition. Even though MCI was authorized to file an amended pleading to respond to GSX's reformulation of its claims, the fact that the court deemed it necessary to issue a post-filing ruling that MCI would be permitted to assert the new counterclaims reveals that the scope of MCI's previously granted leave to amend did not authorize MCI to add or subtract counterclaims. *Cf. Inland Cities Express, Inc. v. Diamond Nat'l Corp.,* 524 F.2d 753, 755 (9th Cir.1975) (disallowing an amendment because it went beyond the scope of leave to amend). Thus, when the court imposed costs on MCI, it effectively had set a condition on MCI's previously unauthorized amendment to the counterclaims. As the district court specifically stated, the costs were ordered because there had been prejudice to GSX arising from the filing, and subsequent dismissal, of the original, meritless counterclaims. Thus, even though the order was mislabeled as a Rule 41 order, we find no abuse of discretion arising from the court's justifiable attempt to compensate

GSX for MCI's backpedaling on its counterclaims. *See Firchau,* 345 F.2d at 275.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**